UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| JACOB GARNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:15 CV215 ACL |
| | ) | |
| NANCY A. BERRYHILL,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Jacob Garner brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's denial of his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Act.

An Administrative Law Judge ("ALJ") found that, despite Garner's severe impairments, he was not disabled as he had the residual functional capacity ("RFC") to perform jobs that exist in significant numbers in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c). A summary of the entire record is presented in the parties' briefs and is repeated here only to the extent necessary.

For the following reasons, the decision of the Commissioner will be affirmed.

---

[1]Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.

# I. Procedural History

Garner filed his applications for DIB and SSI on March 26, 2013. (Tr. 164-76.) He alleged that he became disabled on October 30, 2008, due to bipolar disorder, obesity, depression, anxiety and panic attacks, memory issues, schizoaffective disorder, paranoia, high blood pressure, hypertension, shortness of breath, insomnia, and acid reflux. (Tr. 164-76, 213.) Garner's claims were denied initially. (Tr. 107-08.) Following an administrative hearing, Garner's claims were denied in a written opinion by an ALJ, dated June 20, 2014. (Tr. 11-27.) Garner then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on September 25, 2015. (Tr. 7, 1-5.) Thus, the decision of the ALJ stands as the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

In the instant action, Garner first claims that the ALJ "failed to properly weigh the opinion of the treating physician in accord with SSR 96-2p because the ALJ failed to give good reasons for giving little weight to the well-supported opinion of Dr. Caruso." (Doc. 15 at 9.) Garner also argues that the ALJ erred by "failing to provide a proper credibility analysis as required by SSR 97-7p in that the ALJ failed to base the analysis on the substantial evidence of record." *Id.* at 16.

## II. The ALJ's Determination

The ALJ first addressed the fact that Garner filed prior applications for benefits under Titles II and XVI on January 13, 2010, alleging a disability onset date of October 30, 2008. (Tr. 14.) These claims were denied initially, and were denied by an ALJ on March 1, 2012, after a hearing was held. *Id.* The Appeals Council denied Garner's request for review on March 2, 2013. *Id.* The ALJ noted that Garner was alleging the same onset date of disability that he had

alleged in his prior applications—October 30, 2008. (Tr. 15.) The ALJ found that there was no

basis for reopening the prior applications, and that the prior decision was final and binding.[2]  *Id.*

He therefore only addressed the issue of whether Garner became disabled after March 1, 2012, the

date of the prior unfavorable decision. *Id.*

The ALJ stated that Garner met the insured status requirements of the Social Security Act

through September 30, 2013.[3]  (Tr. 17.) The ALJ found that Garner had not engaged in

substantial gainful activity since his alleged onset date of October 30, 2008. *Id.*

In addition, the ALJ concluded that Garner had the following severe impairments:

schizoaffective disorder, bipolar disorder, depression, anxiety, hypertension, and morbid obesity.

*Id.* The ALJ found that Garner did not have an impairment or combination of impairments that

meets or equals in severity the requirements of any impairment listed in 20 C.F.R. Part 404,

Subpart P, Appendix 1. (Tr. 18.)

As to Garner's RFC, the ALJ stated:

> After careful consideration of the entire record, the undersigned
> finds that the claimant has the residual functional capacity to
> perform light work as defined in 20 CFR 404.1567(b) and
> 416.967(b), meaning the claimant is able to lift and carry 20 pounds
> occasionally and 10 pounds frequently, stand and/or walk 6 hours in

---

[2]Absent a colorable constitutional claim, the Act does not authorize judicial review of a decision
by the Commissioner applying res judicata or a decision of the Commissioner refusing to reopen a
prior claim. *See Boock v. Shalala*, 48 F.3d 348, 351 (8th Cir. 1995); *Brown v. Sullivan*, 932 F.2d
1243, 1245–46 (8th Cir. 1991). No such constitutional claim was presented here and the ALJ's
decision refusing to reopen the prior applications is not reviewable. Thus, the relevant time
period for consideration of Garner's claims begins on March 2, 2012, the date after the last final
denial of Garner's previous claims.

[3]To be entitled to DIB under Title II, Garner must establish that he was disabled prior to the
expiration of his insured status on September 30, 2013. *See* 20 C.F.R. 404.130. As such, the
relevant time period under consideration for Garner's Title II claim is March 2, 2012 through
September 30, 2013. To be entitled to SSI under Title XVI, he must show that he was disabled
while his application was pending. *See* 42 U.S.C. 1382c; 20 C.F.R. § 416.330 and 416.335.

an 8-hour workday, and sit 6 hours in an 8-hour workday.   The
claimant is limited to performing simple, routine, and repetitive
tasks that would not involve fast-paced production work such as an
assembly line worker.   The claimant is limited to only occasional
contact with the public and co-workers and limited to tasks with no
more than occasional changes in a routine work setting.   In
addition, the claimant must avoid work hazards such as exposure to
unprotected heights and dangerous moving machinery.

(Tr. 19.)

The ALJ found that Garner's allegations regarding his limitations were not entirely

credible.   (Tr. 21.)   In determining Garner's RFC, the ALJ indicated that he was assigning "little

weight" to the opinion of treating psychiatrist Dawn Caruso, M.D.   (Tr. 25.)   The ALJ assigned

"significant weight" to the opinion of examining psychologist Georgette Johnson, Psy.D; and

"considerable weight" to the opinion of state agency medical consultant Keith Allen, Ph.D.   *Id.*

The ALJ also noted that he was giving "little weight" to the GAF score of 41-50 assessed by

Courtney Johnson, M.D.[4]   *Id.*

The ALJ further found that Garner is unable to perform any past relevant work.   *Id.*   The

ALJ noted that a vocational expert testified that Garner could perform jobs existing in significant

numbers in the national economy, such as hand washer, ejection molder, and housekeeper/maid.

(Tr. 26.)   The ALJ therefore concluded that Garner has not been under a disability, as defined in

the Social Security Act, from October 30, 2008, through the date of the decision.   (Tr. 27.)

---

[4]Garner does not challenge this finding.

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits filed on March 25, 2013, the claimant is not disabled as defined in sections 216(i) and 223(d) of the Social Security Act.
>
> Based on the application for supplemental security income filed on March 25, 2013, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

*Id.*

# III.   Applicable Law

## III.A.  Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.   42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).   Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable person would find it adequate to support the conclusion.   *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).   This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."   *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).   "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."   *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The plaintiff's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted). *See also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

## III.B. Determination of Disability

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905. A claimant

has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience engage in any other kind of substantial gainful work which exists … in significant numbers either in the region where such individual lives or in several regions of the country."   42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations.   20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).   First, the Commissioner will consider a claimant's work activity.   If the claimant is engaged in substantial gainful activity, then the claimant is not disabled.   20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities."   *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003).   "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."   20 C.F.R. § 416.921(b).   These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.   *Id*. § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S.Ct. 2287, 2291 (1987).   "The sequential evaluation process may be terminated at step two only when the

claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. *See* 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. *See* 20 C.F.R. §§ 404.1520a(b)(3), 416.920a(b)(3). Functional loss is rated on a scale that ranges from no

limitation to a level of severity which is incompatible with the ability to perform work-related activities. *See id.* Next, the Commissioner must determine the severity of the impairment based on those ratings. *See* 20 C.F.R. §§ 404.1520a(c), 416.920a(c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. *See* 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. *See id.* If there is a severe impairment, but the impairment does not meet or equal the listings, then the Commissioner must prepare an RFC assessment. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

## IV. Discussion

Garner argues that the ALJ erred in evaluating the opinion of treating psychiatrist Dr. Caruso, and in assessing the credibility of Garner's subjective complaints. The undersigned will discuss these claims in turn, beginning with the ALJ's credibility analysis.[5]

## 1. Credibility Analysis

Garner testified that he was unable to work because he experiences almost constant auditory hallucinations, and as a result has difficulty concentrating and being around people. (Tr. 21, 39.) The ALJ found that Garner's allegations were not entirely credible. Garner contends that the ALJ's credibility determination is not supported by substantial evidence.

In assessing a plaintiff's subjective complaints, an ALJ is required to examine (1) the claimant's daily activities; (2) the duration, frequency and intensity of pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5)

---

[5]Garner also alleged disability based on physical impairments and the ALJ found that Garner's hypertension and morbid obesity were severe at step two. (Tr. 17.) Because Garner does not challenge the ALJ's findings regarding his physical impairments, the undersigned will not discuss those findings.

functional restrictions.   *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).   An ALJ may disbelieve a claimant's subjective reports due to inherent inconsistencies or other circumstances. *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007).   "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, the Court should defer to the ALJ's credibility determination."   *See Gregg v. Barnhart*, 354 F.3d 710, 713 (8th Cir. 2003).

 The ALJ here identified many reasons to support his findings concerning Garner's subjective complaints, including his poor work history, his daily activities, the effectiveness of his medications, medical evidence documenting improvement, and suggestions in the record that Garner was motivated by secondary gain.   (Tr. 21–25.)

The ALJ first noted that there was no change in Garner's medical condition that occurred on his alleged onset of disability date.   (Tr. 21.)   Rather, Garner reported that he was let go by his last employer because "there were too many kitchen employees and employer did not have enough money to pay all the employees."   (Tr. 189.)   *See Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) ("Courts have found it relevant to credibility when a claimant leaves work for reasons other than her medical condition.").

The ALJ found that Garner's poor work record "does nothing to enhance the claimant's credibility as a person who was ever well motivated to work."   (Tr. 21.)   Garner's work history report reveals he worked only sporadically prior to his alleged onset date.   (Tr. 198.)   The ALJ properly weighed Garner's poor work history.   *See Buckner v. Astrue,* 646 F.3d 549, 556–58 (8th Cir. 2011) (Buckner's sporadic work history prior to his alleged disability date indicated that he was not strongly motivated to engage in productive activity, which weighed against his credibility).

The ALJ also noted that Garner worked part-time after his alleged onset of

disability—from December 1, 2008 to December 15, 2008, earning $1,293.90; and from June 28, 2010, to July 10, 2010 (twelve hours total), earning $41.69. (Tr. 17.) Garner argues that his ability to work part-time is not inconsistent with his allegation of disability. Despite Garner's argument, the ALJ properly considered Garner's part-time work during the relevant period as but one of several factors that detracted from his subjective allegations of symptoms precluding all work. *See Goff,* 421 F.3d at 792 (the ALJ properly considered, as one factor detracting from the claimant's credibility, the fact that she worked part-time as a kitchen aide throughout the time she claimed she was disabled).

The ALJ next discussed Garner's daily activities. He noted that Garner was able to take care of his personal needs, perform household chores, prepare simple meals, shop online, drive, play video games, use the computer, watch television, and read. (Tr. 21, 44-46.) The ALJ stated that, to the extent Garner's daily activities are restricted, they appear restricted mainly as a matter of choice, rather than any apparent medical prescription. (Tr. 21.) The ALJ did not err in finding Garner's daily activities inconsistent with his allegations of disabling symptoms, including difficulty concentrating. *See McDade v. Astrue*, 720 F.3d 994, 998 (8th Cir. 2013) (ALJ properly discounted plaintiff's credibility where, among other factors, plaintiff "was not unduly restricted in his daily activities, which included the ability to perform some cooking, tak[ing] care of his dogs, us[ing] a computer, driv[ing] with a neck brace, and shop[ping] for groceries with the use of an electric cart").

The ALJ stated that no treating physician placed any specific long-term work-related restrictions on Garner's activities or expressed the opinion that he was disabled. (Tr. 21.) The lack of significant limitations set out by treating and examining physicians is relevant to a determination of disability. *See Goff*, 421 F.3d at 792. Garner argues that this statement is

incorrect, as Dr. Caruso found that Garner had many marked and extreme limitations in a Medical Source Statement-Mental ("MSS"). (Tr. 471-72.) Dr. Caruso did find such limitations in her source statement she completed in April 2014, more than a year after she last treated Garner. The ALJ discussed the MSS later in his opinion, and found that it was inconsistent with Dr. Caruso's earlier treatment notes. No other treating physician imposed any work-related limitations, or found that Garner was unable to work. As Defendant points out, psychologist Georgette Johnson recommended Garner pursue vocational rehabilitation after an August 30, 2012 evaluation, suggesting Garner's mental impairments did not preclude all work activity. (Tr. 269.) In sum, although the ALJ's statement was not completely accurate in light of Dr. Caruso's opinion, it does not constitute reversible error since the ALJ fully evaluated and discredited Dr. Caruso's opinion.

The ALJ next found that Garner's medications were "generally effective when taken as prescribed." (Tr. 21.) Evidence of effective medication resulting in relief may diminish the credibility of a claimant's complaints. *See Rose v. Apfel,* 181 F.3d 943, 944 (8th Cir. 1999). Garner argues that his medications were not generally effective because his medical providers made frequent adjustments to his medications. The record nonetheless supports the ALJ's findings that Garner's psychiatric symptoms improved with medication. For example, in January 2013, Garner reported that his auditory hallucinations had really diminished with medication, and Dr. Caruso noted he was tolerating his medications well. (Tr. 278.) The next month, Dr. Caruso noted that Garner was "fairly stable," and that her "biggest concern is the continued weight gain." (Tr. 276.) Garner also reported a decrease in his auditory hallucinations in March 2013 (Tr. 273), and in January 2014 (Tr. 417.)

With regard to side effects, the ALJ acknowledged Garner's hearing testimony that his medications make him sleepy. (Tr. 21, 42.) The ALJ, however, found that there was no

evidence that his medications impose significant side effects.   (Tr. 21.)   This finding is supported by the record, which reveals adjustments were made to medications any time Garner reported side effects.   Garner typically complained of only minor side effects.   For example, in November 2012, Garner reported that he had stopped taking one of his psychotropic medications simply because it was not cherry flavored.   (Tr. 284.)   The presence or absence of side effects from medications is a proper *Polaski* factor.   *See Polaski,* 739 F.2d at 1322.   The ALJ's finding that Garner's medications helped his symptoms and did not result in significant side effects is supported by the record.

Finally, the ALJ considered that Garner began seeing Dr. Caruso on June 5, 2012, because he did not receive disability benefits based on the reports of his previous psychiatrist, Dr. Khot. (Tr. 23, 298.)   Garner reported that his attorney told him to reapply with a new psychiatrist.   *Id.* Garner stated that he had been trying to get disability for three years, and that he planned to marry his girlfriend once this was obtained.   *Id.*   Dr. Caruso indicated that she could not accurately diagnose Garner because she was not sure how truthful he was being, and he seemed to "have a large secondary gain in getting disability."   (Tr. 299.)   When considering a claimant's credibility, an ALJ may properly consider that the claimant appeared to be motivated to qualify for disability benefits.   *See Eichelberger*, 390 F.3d at 590 (8th Cir. 2004) ("[T]he ALJ found that Eichelberger had objectively determinable impairments, but also noted that her incentive to work might be inhibited by her long-term disability check of $1,700 per month.") (citing *Gaddis v. Chater*, 76 F.3d 893, 896 (8th Cir. 1996) (allowing an ALJ to judge credibility based on a strong element of secondary gain).   Thus, the ALJ properly considered Garner's statements to Dr. Caruso showing his motivation to qualify for benefits.

The ALJ thoroughly explained his findings and the inconsistencies in the record upon

which he based the credibility determination.   Because the ALJ pointed to substantial evidence in the record supporting his decision to discount Garner's subjective allegations, the Court defers to the ALJ's credibility finding.   *See e.g., Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007).

**2.        Dr. Caruso's Opinion**

Garner next argues that the ALJ erred in evaluating the opinion of treating psychiatrist Dr. Caruso.   As previously noted, Dr. Caruso completed a MSS on April 9, 2014.   (Tr. 471-72.)   Dr. Caruso expressed the opinion that Garner was extremely limited in the following areas: ability to understand and remember detailed instructions, carry out detailed instructions, perform activities within a schedule and maintain regular attendance, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, and travel in unfamiliar places or use public transportation.   (Tr. 471-72.)   Dr. Caruso found that Garner was markedly limited in the following areas: ability to remember locations and work-like procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, make simple work related decisions, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, be aware of

normal hazards and take appropriate precautions, and set realistic goals or make plans independently of others.   *Id.*

"'It is the ALJ's function to resolve conflicts among the various treating and examining physicians."   *Tindell v. Barnhart,* 444 F.3d 1002, 1005 (8th Cir. 2006) (quoting *Vandenboom v. Barnhart,* 421 F.3d 745, 749–50 (8th Cir. 2005) (internal marks omitted)).   Opinions from medical sources who have treated a claimant typically receive more weight than opinions from one-time examiners or non-examining sources.   *See* 20 C.F.R. § 416.927(c)(1)–(2).   However, the rule is not absolute; a treating physician's opinion may be disregarded in favor of other opinions if it does not find support in the record.   *See Casey*, 503 F.3d at 692.   The treating physician's opinion should be given controlling weight when it is supported by medically acceptable laboratory and diagnostic techniques and it must be consistent with other substantial evidence in the case record.   *Hacker v. Barnhart*, 459 F.3d 935, 937 (8th Cir. 2006).   *See also* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (listing "[s]upportability" as a factor to be considered when weighing medical opinions).   Inconsistencies may diminish or eliminate weight given to opinions.   *Hacker*, 459 F.3d at 937.   *See also Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (holding that a treating physician's opinion "may have 'limited weight if it provides conclusory statements only, or inconsistent with the record'") (quoting *Samons v. Astrue,* 497 F.3d 813, 818 (8th Cir. 2007)).   An ALJ "may discount or even disregard the opinion ... where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Id.* (quoting *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015)).

If an ALJ declines to ascribe controlling weight to the treating physician's opinion, she must consider the following factors in determining the appropriate weight: length and frequency of

the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization. 20 C.F.R. §§ 404.1527(c); 416.927(c). Whether the ALJ grants the treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." *Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005). "Failure to provide good reasons for discrediting a treating physician's opinion is a ground for remand." *Reed v. Barnhart*, 399 F. Supp.2d 1187, 1194 (E.D. Mo. 2004).

The ALJ stated that he was assigning "little weight" to the MSS of Dr. Caruso because it was "a product of a pre-printed form questionnaire solicited by claimant's attorney and fails to articulate the basis of the limitations indicated and is inconsistent with this physician's own treatment records that note a GAF score of 65[6] on June 5, 2012, which denotes mild limitations in social and occupational functioning." (Tr. 25.) The ALJ further noted that Dr. Caruso indicated on February 19, 2013 that Garner's "symptoms are fairly stable on his psychotropic regimen." *Id.*

The ALJ determined that Dr. Caruso's opinions in the April 2014 MSS were not entitled to controlling weight because her opinions were inconsistent with her own clinical treatment notes. "It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes." *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (rejecting challenge to lack of weight given treating physician's opinion where the physician renders inconsistent opinions that undermine the credibility of such opinions).; *see also Clevenger*

---

[6]A GAF score of 61 to 70 denotes "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* 34 (Text Revision 4th ed. 2000) ("*DSM IV–TR*").

*v. S.S.A.*, 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment notes).

The ALJ acknowledged that Dr. Caruso was Garner's treating psychiatrist beginning on June 5, 2012. (Tr. 23.) The ALJ discussed Dr. Caruso's treatment notes, which show she treated Garner on twelve occasions from June 2012 to March 2013. (Tr. 273-99.) Dr. Caruso's treatment notes, which are discussed below, support the ALJ's finding.

As previously noted, Garner began seeing Dr. Caruso because his previous psychiatrist's reports were not favorable to his disability claims. (Tr. 298.) At his initial visit, Dr. Caruso noted that Garner had been hospitalized at Southeast Hospital on several occasions in the past,[7] and had been seeing Dr. Khot at Community Counseling Center. *Id.* Garner complained of auditory hallucinations, which were present all the time and talk to him in a negative way. *Id.* He also reported panic attacks and irritability. *Id.* Garner indicated he was receiving Invega[8] injections, which had been helpful for the paranoia, but had caused him to gain one hundred pounds. *Id.* Garner then spent "a large portion" of his time with Dr. Caruso discussing his application for disability benefits. *Id.* Upon mental status examination, Garner was pleasant, cooperative, exhibited good eye contact, was calm, was accompanied by his girlfriend, his speech rate and intonation were normal, his affect was euthymic, he was logical, he denied suicidal or homicidal ideations, and reported auditory hallucinations and paranoid delusions. (Tr. 299.) Dr. Caruso assessed a GAF score of 65 and indicated that she could not accurately diagnose Garner

---

[7]The ALJ discussed these three hospitalizations—in August 2008 and April and May of 2010—due to psychotic symptoms and exhibiting bizarre behavior. The undersigned has reviewed these records. Because these hospitalizations occurred prior to the relevant period, the records will not be discussed in detail herein.
[8]Invega is an antipsychotic drug indicated for the treatment of mental disorders such as schizoaffective disorder. *See* WebMD, http:// www.webmd.com/drugs (last visited February 28, 2017).

without his records.  *Id.*   She also referred him to Georgette Johnson, Ph.D. for psychological testing.  *Id.*

On June 20, 2012, Garner reported that he was still depressed and was still experiencing auditory hallucinations.  (Tr. 296.)   Upon examination, Garner's affect was dysphoric, his perception was good, his thought process was linear and goal directed, his thought content was logical, his memory was intact, his insight and judgment were fair, and his attention span and concentration were good.  *Id.*   Dr. Caruso discontinued the Invega and started Garner on new medications that were less likely to cause weight gain.  *Id.*   On August 8, 2012, Garner reported that he was doing better with the auditory hallucinations.  (Tr. 292.)   He complained of irritability and lack of energy or motivation.  *Id.*   Garner reported that he smoked two packages of cigarettes a day.  *Id.*   Dr. Caruso discussed gastric bypass surgery given Garner's morbid obesity.  *Id.*   Dr. Caruso indicated that she had received Garner's records from Dr. Khot, which revealed an initial diagnosis of bipolar disorder but a subsequent change in diagnosis to schizoaffective disorder.  *Id.*   Upon examination, Garner was pleasant, cooperative, calm, exhibited good eye contact, his speech was normal, his affect was euthymic, his thought content and process were normal, he reported no delusions or hallucinations, and his judgment and insight were fair.  *Id.*  Dr. Caruso diagnosed Garner with schizoaffective disorder and adjusted his medications.  *Id.*   On September 10, 2012, Garner reported that his sleep was better, but he continued to hear voices in the third person.  (Tr. 290.)   He indicated that he did okay when he was alone, but had difficulty when he was around people.  *Id.*   Garner also complained that he had no energy, but indicated that he was still smoking two packages of cigarettes a day and was not exercising.  *Id.*   Upon examination, Dr. Caruso's findings remained unchanged, except that she described his judgment and insight as "good."  *Id.*   Dr. Caruso adjusted Garner's medications,

and counseled him to lose weight and stop smoking "to feel better physically and mentally." *Id.* On October 9, 2012, Garner reported that he was still experiencing auditory hallucinations. (Tr. 288.) He indicated that he was still smoking, and that he had recently gone to the emergency room due to chest pain that radiated down his left arm but was told it was merely muscle pain. *Id.* Garner's girlfriend reported that Garner was a "hypochondriac." *Id.* Dr. Caruso's findings on mental examination remained unchanged. *Id.* She adjusted Garner's medications, encouraged him to lose weight and stop smoking, and suggested he obtain a sleep study given his morbid obesity. *Id.* Dr. Caruso stated that improving his sleep will have an impact on his mental status if sleep apnea is occurring. *Id.* On November 6, 2012, Garner reported minimal improvement with a medication change to Saphris.[9] (Tr. 286.) He indicated that he gained back nine pounds he had lost, but admitted it was because he was choosing to eat poorly and was not exercising. *Id.* Dr. Caruso increased the dosage of the Saphris. *Id.* On December 4, 2012, Garner reported that he had stopped taking the Saphris because the higher dosage was note cherry flavored. (Tr. 284.) Garner continued to gain weight and was over 400 pounds. *Id.* Upon examination, Garner was pleasant, cooperative, calm, exhibited good eye contact, his speech was normal, his affect was dysphoric, his thought content and process were normal, he reported auditory hallucinations, he denied suicidal or homicidal ideation, and his judgment and insight were fair. *Id.* Dr. Caruso started Garner on Fanapt,[10] and stated that she was "very concerned" about Garner's weight. *Id.* She encouraged Garner to watch his diet, exercise, and decrease his smoking. *Id.* Two weeks later, Garner complained that the Fanapt seemed to make the voices worse. (Tr. 282.) Dr.

---

[9]Saphris is an antipsychotic drug indicated for the treatment of mental disorders such as schizoaffective disorder. *See* WebMD, http:// www.webmd.com/drugs (last visited February 28, 2017).

[10]Fanapt is an antipsychotic drug indicated for the treatment of mental disorders such as schizophrenia. *See* WebMD, http:// www.webmd.com/drugs (last visited February 28, 2017).

Caruso noted that Garner had undergone psychological testing and Garner was diagnosed with bipolar affective disorder, psychotic disorder not otherwise specified, panic disorder not otherwise specified, and generalized anxiety disorder with features of agoraphobia and panic; rule out schizoaffective disorder and paranoid schizophrenia. *Id.* Dr. Caruso diagnosed Garner with schizoaffective disorder. *Id.* She discontinued the Fanapt, and started him on Thorazine.[11] *Id.* She also started him on a trial of Topamax[12] to help with his mood, and noted that Garner was at a "highly concerning weight." *Id.* On January 8, 2013, Garner reported that the Thorazine helped make the auditory hallucinations "tolerable." (Tr. 280.) He complained of decreased energy. *Id.* Dr. Caruso adjusted Garner's medications to help with smoking cessation and weight loss. *Id.* On January 22, 2013, Dr. Caruso again discussed Garner's weight and smoking cessation at length. (Tr. 278.) Garner reported that his hallucinations were "greatly diminished." *Id.* On February 19, 2013, Dr. Caruso stated Garner was "fairly stable at this time. The biggest concern is the continued weight gain." (Tr. 276.) Dr. Caruso continued Garner's medications, and strongly encouraged him to continue exercising, work on losing weight, and decrease his smoking. *Id.* On that date, Dr. Caruso referred Garner to Dr. Courtney Johnson at Community Counseling Center for treatment, as Dr. Caruso was leaving the practice. (Tr. 275.) In a letter to Dr. Johnson, Dr. Caruso indicated that Garner carries a diagnosis of schizoaffective disorder and "has been stable for a couple of months." *Id.*

On March 13, 2013, Garner's last visit with Dr. Caruso, Garner reported a decrease in his auditory hallucinations. (Tr. 273.) He continued to gain weight, weighing 480 pounds at that

---

[11]Thorazine is an antipsychotic drug indicated for the treatment of mental disorders such as schizophrenia. *See* WebMD, http:// www.webmd.com/drugs (last visited February 28, 2017).
[12]Topamax is an anticonvulsant or antiepileptic drug indicated for the treatment of seizures and migraine headaches. *See* WebMD, http:// www.webmd.com/drugs (last visited February 28, 2017).

time.  *Id.*  Garner reported that he understood how detrimental it was, but continued to eat and smoke two packages of cigarettes a day.  *Id.*  Upon examination, Garner was pleasant, cooperative, calm, exhibited good eye contact, his speech was normal, his mood was "okay," his affect was somewhat dysphoric, his thought content was logical, his thought process was linear and goal directed, he denied suicidal or homicidal ideation, and his judgment and insight were poor.  *Id.*  Dr. Caruso continued Garner's medications.  *Id.*

Dr. Caruso's treatment notes do not support the presence of marked and extreme limitations as expressed in her MSS.  As the ALJ noted, the GAF score of 65 Dr. Caruso assessed in June 2012 is indicative of only mild limitations in social and occupational functioning.  (Tr. 299.)  Although GAF scores do not have a direct correlation to SSA severity requirements, they may be considered in reviewing an ALJ's determination that a treating source's opinion was inconsistent with the treatment record.  *Myers v. Colvin*, 721 F.3d 521, 525 (8th Cir. 2013).

In addition, Dr. Caruso's clinical findings were minimal.  Upon mental examination, Dr. Caruso consistently noted that Garner was pleasant, cooperative, calm, exhibited good eye contact, his speech was normal, his thought content was logical, his thought process was linear and goal directed, and he denied suicidal or homicidal ideation.  The treatment notes support the ALJ's finding that Garner's reported auditory hallucinations improved with treatment.  (Tr. 280, 275, 278, 273.)  In February of 2013, Dr. Caruso indicated that Garner was stable, and that her biggest concern at that time was Garner's continued weight gain.  (Tr. 276.)  Indeed, Dr. Caruso dedicated a significant amount of her treatment notes to discussing concerns about Garner's continued weight gain and smoking.

The ALJ also properly pointed out that Dr. Caruso's opinions were the product of a pre-printed form questionnaire solicited by claimant's attorney, and that she failed to articulate the

basis of the limitations found.   (Tr. 25.)   *See Toland v. Colvin*, 761 F.3d 931, 937 (8th Cir. 2014)

(holding that an ALJ may discount a conclusory medical opinion).   Not only did Dr. Caruso fail to

cite any clinical findings to support her opinions, but she had last treated Garner in March 2013,

over one year prior to completing the MSS.

Garner contends that, even if Dr. Caruso's opinion was not supported by her own treatment

notes, this is a reason for the ALJ to give non-controlling weight but would not be sufficient to give

the opinion non-substantial weight.   Garner relies on *Papesh v. Colvin*, 786 F.3d 1126, 132 (8th

Cir. 2015), for this proposition.   It is true that in *Papesh* the Eighth Circuit found that a treating

physician's opinion should not "*ordinarily* be disregarded and is entitled to substantial weight."

786 F.3d at 1132 (emphasis added).   The Court, however, further noted that a treating physician's

opinion may have "'limited weight if it provides conclusory statements only, or is inconsistent

with the record.'"   *Id.* (quoting *Samons*, 497 F.3d at 818).   The ALJ in this case, consistent with

*Papesh*, found that Dr. Caruso's opinion was entitled to limited weight because it was both

inconsistent with her own treatment notes and conclusory.

The undersigned, therefore, finds that the ALJ provided sufficient reasons for assigning

little weight to the opinions provided by Dr. Caruso in her April 2013 MSS.

In determining Garner's mental RFC, the ALJ also indicated that he was assigning

"significant weight" to the opinions of examining psychologist Dr. Georgette Johnson, who found

that Garner's mental impairments imposed moderate limitations in social and occupational

functioning.   (Tr. 25, 269.)   Dr. Johnson recommended that Garner pursue vocational

rehabilitation.   (Tr. 269.)   The ALJ also accorded "considerable weight" to the opinion of state

agency medical consultant, Keith Allen, Ph.D., who found that Garner retained the ability to

perform simple, repetitive tasks on May 21, 2013.   (Tr. 25, 87.)

The ALJ concluded that Garner had the mental RFC to perform simple, routine, and repetitive tasks that would not involve fast-paced production work. (Tr. 19.) He further limited Garner to only occasional contact with the public and co-workers and tasks with no more than occasional changes in a routine work setting. *Id.*

The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. 20 C.F.R. § 404.1545(a); *Anderson v. Shalala,* 51 F.3d 777, 779 (8th Cir. 1995); *Goff v. Barnhart,* 421 F.3d 785, 793 (8th Cir. 2005). A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination. *Id.; Hutsell v. Massanari,* 259 F.3d 707, 711–12 (8th Cir. 2001); *Lauer v. Apfel,* 245 F.3d 700, 703-04 (8th Cir. 2001); *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. *Hutsell,* 259 F.3d at 712. However, although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant is able to perform certain functions. *Pearsall,* 274 F.3d at 1217 (8th Cir. 2001); *McKinney,* 228 F.3d at 863. The claimant bears the burden of establishing his RFC. *Goff,* 421 F.3d at 790.

The mental RFC formulated by the ALJ is supported by substantial evidence in the record as a whole. The ALJ found that Garner's subjective allegations of disabling mental symptoms were not entirely credible. The ALJ considered Dr. Caruso's treatment notes, which revealed that Garner's psychiatric symptoms were controlled with medication. He also considered Dr. Johnson's opinion that Garner had moderate limitations which would not prevent him from all

work activity.    The ALJ's determination is supported by state agency psychologist Dr. Allen's opinion that Garner retained the ability to perform simple, repetitive work.

After determining Garner's RFC, the ALJ found that Garner was unable to perform any past relevant work.    (Tr. 25.)    The ALJ properly relied on the testimony of a vocational expert to find that Garner could perform other work existing in significant numbers in the national economy with his RFC.    (Tr. 26.)    *See Robson v. Astrue*, 526 F.3d 389, 392 (8th Cir. 2008) (holding that a vocational expert's testimony is substantial evidence when it is based on an accurately phrased hypothetical capturing the concrete consequences of a claimant's limitations).    Thus, the ALJ's decision finding Garner not disabled is supported by substantial evidence.

Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.

Dated:    <u>March 28, 2017</u>

_____
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE